**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **MITCHELL MIZEL, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>v.<br><br>**NETWORK-1 TECHNOLOGIES, INC. AND COREY M. HOROWITZ,**<br><br>**Defendants.** | **Civ. No.**<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE INVESTMENT COMPANY ACT OF 1940**<br><br><br>**JURY TRIAL DEMANDED** |

### I.       INTRODUCTION

1.       Plaintiff Mitchell Mizel ("Mizel"), by and through his undersigned counsel, respectfully submits this Class Action Complaint ("Complaint") alleging claims under the Investment Company Act of 1940 (the "ICA") against Defendants Network-1 Technologies, Inc. ("Network-1", "NTIP", or "the Company") and its CEO, Corey M. Horowitz ("Horowitz"). Plaintiff brings these claims on behalf of himself and all persons and entities other than Defendants who presently own Network-1 stock, and their successors in interest (the "Class"), as well as on behalf of a Subclass of all persons and entities who held Network-1 stock on July 23, 2024, the record date for voting at the Company's annual meeting (the "Annual Meeting") to be held on September 17, 2024 (the "Voter Subclass"). Excluded from the Class and Voter Subclass are Defendants, their families, and their affiliates. Plaintiff alleges the following based upon information and belief, except as to those allegations concerning Plaintiff which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which includes a review and analysis of:

(1) Network-1's regulatory filings with the SEC; (2) press releases disseminated by the Company; (3) other public information regarding the Company; and (4) counsel's independent investigation.

## II.     NATURE OF THE ACTION

2.     Plaintiff Mizel is an owner of Network-1 common stock, who held on July 23, 2024, and therefore is eligible to vote at the Company's September 17, 2024 Annual Meeting.  Mr. Mizel intends to continue to hold Network-1 stock.   Network-1 is a Connecticut-based, Delaware-incorporated public corporation whose shares trade on the NYSE American Exchange under the symbol, "NTIP."  It transacts business in the Southern District of New York, but has only two purportedly full-time employees; CEO Horowitz and Mr. Jonathan Greene, who is EVP, corporate secretary and a member of the Board of Directors (the "Board.").

3.     Plaintiff brings suit under the ICA, which was enacted in 1940 by Congress to protect investors in companies which meet the ICA's definition of an "investment company."  Such investment companies, which typically make a variety of passive investments, are run by persons who select those investments, and are deemed "investment advisers."[1]  The ICA creates a panoply of investor protections, which include: a stockholder approved investment plan; capital structure limitations; stockholder-approved  investment adviser compensation agreements (and the right to vote to revoke such agreements); strict prohibition of related party transactions without SEC approval; the right to directly challenge excessive adviser compensation; change of control restrictions; a stockholder veto over any change in ICA status; and more.

4.     In defining an "investment company" under the ICA, Congress adopted a test that is mathematical and easy to apply.  An "investment company" is an entity which is "engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of

---

[1] An "investment adviser" is defined by Congress as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities…"  15 USC §80b-2(a)(11). Here, CEO Horowitz fulfills this role, and meets this definition.

such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis. Network-1 easily meets this test. Its most recent quarterly filing on Form 10-Q (dated May 10, 2024) shows that almost all of its assets consist of investment securities. Yet, despite urging by Plaintiff, Network-1 has refused to register as an investment company (as the ICA requires) or otherwise comply with the provisions of the ICA that protect investors.

5.      A refusal by a company that meets the definition of an investment company to register as one does not free it from ICA compliance. It still must comply, as allowing companies to evade the ICA by not registering would render the ICA ineffective.[2]

6.      Network-1 was at one time more actively involved in a business other than securities investing. Traditionally, it purchased patent portfolios and then sued large companies to obtain royalty settlements (the "Legacy Business"). However, *Network-1 has purchased only one small patent portfolio in the past 10 years.* Scant litigation remains. It is clear that Network-1 is winding down, is basically on auto-pilot, and is being run for the benefit of Mr. Horowitz. Stock performance has been abysmal: in the past three years the stock has dropped 33% (including dividends), while the Russell 2000 small cap index has declined only 9%. The CEO's performance has fallen far short of targeted stock price goals.

7.      Network-1 does not behave like an active operating business. Plaintiff discovered that its purported corporate headquarters is all but abandoned, the door locked, with no personnel in attendance. Mail piles up outside the door, unopened, and is eventually returned to sender. Until Plaintiff informed Network-1 of this, it had no current business relationship with a Delaware corporate

---

[2] "Otherwise, an investment company which violates the Act by not registering would be subject to less stringent regulation than a company which complies with the Act by registering, a result which is plainly unreasonable." *In re Townsend*, 42 S.E.C. 282, 317, 1964 SEC LEXIS 341, *59 (SEC Sept. 2, 1964) *Accord, Goldman v. McMahan, Brafman, Morgan & Co.*, No. 85 Civ. 2236 (PKL), 1987 U.S. Dist. LEXIS 5356, at *51-57 (S.D.N.Y. June 17, 1987); *In re The Commercial Bank*, 1994 SEC LEXIS 3742, *15 (SEC Dec. 6, 1994) ("Several of the provisions and rules of the Investment Company Act discussed in this Order proscribe conduct by registered investment companies. However, the fact that Commercial was unlawfully operating the IRA Fund on an unregistered basis does not insulate it from the requirements of the Investment Company Act which apply to registered investment companies.").

registered agent, contrary to Delaware law, and appeared delinquent in its Delaware annual report and payment of franchise fees.

8.    The CEO's duties call for little work, yet in the latest fiscal year he received an excessive payment package of $904,072.   As there is minimal corporate activity, his compensation should likewise be minimal.   Moreover, his contract is unlawful, as it has never been stockholder approved, and is not even now being put before the stockholders at the Annual Meeting for their binding approval or disapproval.   This is required by the ICA.   Thus, Plaintiff and the Voter Subclass are being unlawfully deprived of their ICA voting rights.   Therefore, Plaintiff brings this action under Section 15(a) of the ICA, which requires such a vote, and on behalf of the Class under Section 36(b) of the ICA, which provides a direct right of action to redress improper adviser compensation.

9.    Network-1 embeds its deprivation of the stockholders' ICA rights in its By-Laws which, under Delaware law, represent a contract between the corporation and its stockholders.   This cannot be allowed to stand, and fortunately the ICA provides a remedy.   A court under ICA Section 47(b) at the application of the offended party may *rescind* any contract violative of the ICA-- and which contradicts its mandates--and such rescissory power extends to corporate By-Laws.[3]

10.    Here, various provisions of Network-1's Second Amended and Restated By-Laws (the "By-Laws") are at odds with the ICA.   For example, Section 28(a) provides:

> All officers shall hold office at the pleasure of the Board of Directors and until their successors shall have been duly elected and qualified, unless sooner removed.  Any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors.

11.    This is inconsistent with the ICA as the CEO, who also serves as investment adviser, can only assume and retain that position at the behest of the voting stockholders under ICA Section 15(a), and is not "appointed" by the Board of Directors.   In addition, the investment adviser, under

---

[3] *See Saba Capital Master Fund, Ltd.. v. Blackrock Mun. Income Fund, Inc*., No. 23-cv-5568 (JSR), 2024 U.S. Dist. LEXIS 2437 (S.D.N.Y. Jan. 4, 2024), *aff'd sub nom, Saba Capital Master Fund, Ltd. v. Blackrock ESG Capital Allocation Tr.,* Nos. 23-8104 (L), 24-79 (CON), 24-80 (CON), 24-82 (CON), 24-83 (CON), 24-116 (CON), 24-189 (CON), 2024 U.S. App. LEXIS 15648 (2d Cir. June 26, 2024).   Section 47(b) is codified at 15 USC §80a-46(b).

ICA Section 15(c) may be removed by the stockholders, even over the objection of the Board. Moreover, the investment adviser's employment contract must be approved *by the stockholders,* not only the Board. Thus, By-Laws Section 28(a) must be rescinded.

12.    Plaintiff and the Class and Subclass members are being deprived of their voting rights and other ICA rights which are considered property rights, without which the value of their shares is diminished.  This unlawful deprivation is both ongoing and imminent.

13.    Plaintiff and the Class and Subclass are entitled to relief under the ICA including: (1) an Order providing that Network-1 meets the definition of an "investment" company, and that its stockholders are entitled to voting rights as specified in ICA Section 15; (b) an Order that Plaintiff and Subclass members be permitted to cast a binding vote on the adviser contract and compensation at the Annual Meeting or, alternatively, the vote be voided and a re-vote ordered; (c) an Order that the violative By-Laws provision cited herein be rescinded under Section 47(b), along with any other By-Laws provisions found inconsistent with the ICA; and (d) an Order that the CEO be required to return any unreasonable compensation under ICA Section 36(b)[4] and that his contract, if ever lawful, is now unlawful due to a failure of approval and ratification at the Annual Meeting.

### III.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b),  28 U.S.C.A. § 1331, and 28 U.S.C. § 1391(b).

15.    This Court has personal jurisdiction over Network-1 because Network-1 has sufficient minimum contacts within the District and with the United States as to render the exercise of jurisdiction over Network-1 by this Court permissible.  Network-1 conducts continuous and systematic business in this District, including the filing of lawsuits and hiring of attorneys for litigation in New York federal

---

[4] An unreasonable compensation claim under ICA Section 36(b) is not a traditional derivative claim but rather is "hybrid" claim which may be brought directly to recover funds for the corporation.  *See Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC,* 595 F.3d 86, 96-98 (2d Cir. 2010).  No demand on the Board is required before it is asserted. *Daily Income Fund v. Fox,* 464 U.S. 523, 524-25, 104 S. Ct. 831, 832-33 (1984).

court in this District (the Southern District of New York), and New York state court located in this District (the New York Supreme Court and its First Department Appellate Division). In addition, Network-1 is registered to do business in New York.

16.     This Court has personal jurisdiction over defendant Horowitz, as Horowitz controls Network-1 and its actions in this District as provided in the ICA, 15 U.S.C. § 80a-2(a)(9), through his beneficial 29.3% stock ownership in Network-1. In addition, the ICA authorizes nationwide service of process under 15 U.S.C. § 80a-43. Horowitz, as a resident of the State of Connecticut, resides within the territorial boundaries of the United States, and has minimum contacts with the United States.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, including dissemination into this District of a proxy statement that does not comport with the ICA; Network-1 holding its Annual Meeting in New York and all states (as there is no physical location); Network-1 forming contractual agreements with persons in this District relating to the corporate By-Laws; the employment agreement with Network-1 under which Mr. Horowitz is employed (and which is one of the subjects of this action) bearing the address 445 Park Avenue, Suite 912, New York, NY 10022, and providing in Section 23: "This Agreement will be governed by, construed and enforced in accordance with, the laws of the State of New York without giving effect to principles of conflicts of laws"; and both defendants being subject to the Court's personal jurisdiction with respect to this action.

### IV.    <u>THE PARTIES</u>

18.     Plaintiff Mitchell Mizel is a Network-1 common stockholder, who held shares as of the July 23, 2024 Annual Meeting record date and who continues to hold Network-1 shares.

19.     Defendant Network-1 is a Delaware corporation, which claims corporate headquarters in New Canaan, Connecticut, but such corporate headquarters appear not to be in any regular use. Its stock is traded on the NYSE American Exchange under the symbol "NTIP." It has approximately 23.4 million outstanding shares.

20.     Defendant Horowitz is a resident of the State of Connecticut and Network-1's CEO, Chairman and *de facto* Investment Adviser, as well as its presumed controller under the ICA.

V.     **SUBSTANTIVE ALLEGATIONS**

A.     **Network-1's Historical Reliance on Patent Litigation and Royalties**

21.     Network-1 originally went public in November 1998 as Network-1 Security Solutions, Inc. (the "Predecessor")[5] and developed, marketed, licensed and supported a family of network security software products designed to provide security to computer networks, including Internet-based systems.  (Prospectus dated November 12, 1998 at 3).  However, by December 2002, the Predecessor had discontinued offering its products due to insufficient revenue and was actively seeking a merger party.  During this time, the Predecessor completed the sale of its technology and related intellectual property to a third party. (Form 10KSB for the fiscal year ended December 31, 2002 filed with the SEC on September 25, 2003 at  2).

22.     By the time that the Company filed its Form 10KSB for the fiscal year ended December 31, 2003, NTIP had acquired a portfolio of telecommunications and data network patents which became its new business.  *Id.* at 2.   The initial patents were part of what the Company refers to as the Remote Power Patent, which essentially related to the delivery of power over Ethernet cables.  (2003 10K at 3).  Litigation related to the Remote Power Patent has generated the bulk of the Company's revenue over the years, as described in the 2023 Form 10K at 3:

> We have been dependent upon our Remote Power Patent for a significant portion of our revenue. Our Remote Power Patent has generated revenue in excess of $188,000,000 from May 2007 through December 31, 2023. *We no longer receive revenue for our Remote Power Patent for any period subsequent to March 7, 2020 (the expiration date of the patent).* During the year ended December 31, 2023, our Remote Power Patent generated all of our revenue of $2,601,000 as a result of litigation settlements relating to periods prior to March 7, 2020 (see "Legal Proceedings at pages 20 - 21.) *Our future revenue is largely dependent on our ability to monetize our other patent assets.* (Emphasis added).

23.     Currently, according to the Company's most recent Form 10-Q filed on May 10,

---

[5] Ultimately on October 9, 2013, NTIP filed an amendment to its Certificate of Incorporation to change the company name to its current version.

2024, NTIP is purportedly still "engaged in the development, licensing and protection of its intellectual property assets." (2024 1Q Form 10-Q at 8). The Company claims to own 102 U.S. patents (although 54 are expired) and 15 foreign patents related to five major technology areas. *Id.*

24.     However, the patent portfolio does not at this juncture create substantial revenue, and the possibility that it will do so in the future may best be described as unlikely. As noted at p. 13 of the 2023 10K, filed on March 8, 2024, revenue and net income from patent-related sources have been severely tapering off, as demonstrated below:

| YEAR | REVENUE | NET INCOME (LOSS) |
|------|---------|-------------------|
| 2023 | 2,061,000 | (1,457,000) |
| 2022 | zero | (2,236,000) |

25.     The most recent significant revenues—achieved almost three years ago in 2021—appear to be the "last gasp" for any significant patent-related revenue flow.

26.     Such current litigation as is still pending has its origin in lawsuits commenced many years ago which, unfortunately, have thus far been unsuccessful. Two cases are on appeal after losses at the District Court level. The odds of reversal, based on federal statistics for 2023, are very poor (as there is an over 80% affirmance rate in these types of cases). But even if one or both of these cases is reversed, this would just be part of the "wind down" of Network-1's patent litigation business.

27.     Other patent portfolios seem to promise little. In March 2022, the Company acquired the HFT Patent Portfolio, but paid only $500,000, which indicates no great value is expected. The Cox Patent Portfolio was acquired in February 2013 for only $1 million in cash, and 403,226 shares of common stock, then worth about $400,000. This small acquisition price reflects the expected value of that Portfolio. Likewise, the Mirror Worlds Patent Portfolio was purchased in 2013 for only $3 million, plus some warrants. These relatively small expenditures indicate that there are few attractive patent portfolios to acquire or that, if such attractive portfolios exist, NTIP

cannot outbid better-financed competitors to acquire them. In either event, the Company's patent litigation business has grown increasingly moribund, and unproductive.[6]  *As noted, NTIP has acquired only one small patent portfolio in the past 10 years.*

**B.    The Company's Value is Evaporating as No Viable Business Plan**
**is Being Pursued to Maximize (Or Even Preserve) Stockholder Value**

28.    Under the CEO's leadership, NTIP's stock price has suffered from the Company's diminishing success, decreased business activities, and lack of any apparent corporate initiatives that could serve to increase corporate value. NTIP went public at $6.00 per share. Since 2005, the stock has never surpassed $5.00 per share. NTIP currently trades at $1.57 per share.[7]  In terms of total stockholder return, performance has been abysmal. Over the past roughly seven years, a $10,000 investment in NTIP would presently be worth $5,363 (assuming dividend reinvestment), a 47% decline. By contrast, the NASDAQ Composite Index increased in that same timeframe 180%.

29.    Network-1 does not maintain the personnel and infrastructure necessary to carry out an active business and maximize stockholder value. According to the 2023 10K, NTIP only has two "full time" employees and two consultants providing monthly services. (2023 10K at 10).

---

[6] Some recognition of the increasingly unviable nature of the IP business may be reflected in NTIP's passive $7,000,000 investment in the securities of ILiAD Biotechnologies, LLC ("ILiAD"), a clinical stage biotechnology company. On December 31, 2023, NTIP owned approximately 6.7% of the outstanding units of ILiAD on a non-fully diluted basis and 5.4% of the outstanding units on a fully diluted basis. NTIP seems to have one seat on ILiAD's Board, and no control. NTIP began investing in ILiAD almost six years ago, in December 2018, and has recognized passive "paper" gains based on changes in ILiAd's venture capital valuation reflected by an August 2022 private financing. It is uncertain whether ILiAD will ever produce a viable product, or an actual, gain, and the investment "remains subject to substantial risks." (2023 10K at 11).

[7] There are presently 23.4 million common shares outstanding, as of May 3, 2024.

30.     Defendant Horowitz is reaping substantial compensation for apparently very little success and, at this point, little work.  On March 22, 2022, a year with **no** revenue reported, the Company entered into a new employment agreement with Horowitz (the "Horowitz Employment Agreement"), which provided for an annual base salary of $535,000, guaranteed amounts of restricted stock units and incentive compensation equal to 5% of the Company's gross royalties or other payments from licensing activities with respect to the Remote Power Patent and a 10% net interest of royalties and payments with patents and the Company's passive investment in ILiAD, other than the Remote Power Patent.  According to the 2023 10K, this translated into incentive compensation of $130,000 for the fiscal year ended December 31, 2023, despite the fact that NTIP recorded a net loss of almost $1.5 million.  (2023 10K at 40).

31.     In the Proxy Statement for the Annual Meeting, Network-1 reports that in the past year Mr. Horowitz received $904,072 in total compensation, including $545,572 in salary; $305,000 in bonus; and $53,500 in other compensation.  Despite poor performance, the $305,000 in bonuses (consisting of $175,000 in an "annual discretionary bonus" and $130,000 as an "incentive" bonus) appear to be the largest bonuses Mr. Horowitz has received in recent years.

### C.     Network-1 Is An Investment Company

32.     ICA Section 3(a)(1)(C) defines in part an investment company subject to its provisions as any enterprise that "owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."  15 U.S.C. §3(a)(1)(C).

33.     NTIP's financials establish that as of March 31, 2024, it had total assets (excluding cash) of about $31.5 million.  Of those total assets, more than 80% of those assets are in marketable securities at fair value ($25,289,000) with the remainder in "other current assets" ($218,000).  The remaining assets consist of cash and cash equivalents ($18,105,000) with smaller amounts in patents, net of accumulated amortization ($1,296,000); equity investment ($4,621,000)(reflecting a diminished passive $7 million investment in ILiAD); operating leases right-of-use asset

($75,000) and a $13,000 security deposit which collectively total just over $6 million.  Thus, less than $2 million of the $49.6 million total assets are patent-related.  Clearly, NTIP is at present only minimally engaged in the patent industry, and the bulk of its assets are investment-related. As such, Network-1's income derives predominantly from passive investments and the vast majority of its assets are tied up in such investments.  All income in the past two years has been from interest and investments.

34.    The NTIP balance sheet as of March 31, 2024 reflects assets as follows:

| ASSET | VALUE | PERCENTAGE IN INVESTMENT SECURITIES[8] |
|---|---|---|
| **Cash** | **18,105,000** | -- |
| **Marketable Securities, consisting of:** | **25,289,000** | -- |
| *Certificates of Deposit* | **6,170,000** | -- |
| *Government Securities* | **11,357,000** | -- |
| *Fixed Income Mutual Funds* | **7,610,000** | -- |
| **Patents** | **1,296,000** | -- |
| **Equity Investment** | **4,621,000** | -- |

---

[8] *See* 15 USC § 80a-3(a)(2).

| | | |
|---|---|---|
| **Miscellaneous** | **306,000** | -- |
| **All assets[9]** | **49,617,000** | -- |
| **Cash & Government Securities** | **29,462,000** | -- |
| **Total Assets Less Cash & Government Securities** | **20,155,000** | -- |
| **Investment Securities[10]** | **19,697,000** | **~98%** |

35.    Given that 98% of NTIP's assets sit in investment securities, as described above, there can be no doubt that the Company is a statutory investment company.[11]    Accordingly, Network-1 must obey all ICA rules and regulations, including those according Network-1 stockholders certain voting and approval rights as enumerated herein.

## CLASS ACTION ALLEGATIONS

36.    Plaintiff repeats and realleges all previous allegations.

37.    Plaintiff brings these claims on behalf of himself and all persons and entities other than Defendants who presently own Network-1 stock, and their successors in interest (the "Class"), as well as on behalf of a Subclass of all persons and entities who held Network-1 stock on July 23, 2024, the

---

[9] Less $218,000 in unclassified assets.

[10] Certificates of Deposit; Fixed Income Mutual Funds; Patents; Equity Investment.  Fixed income instruments "may constitute investment securities for purposes of the 40 percent test." *In re Accor Services,* 2010 SEC No-Act. LEXIS 422, *18 (SEC June 7, 2010).

[11] Even if Network-1 was still primarily engaged in IP exploitation in the form of the receipt of settlements and royalties, such proceeds may still be considered passive, as the agreements reached by Network-1 do not satisfy the requirement of a "direct nexus" between the ultimate sale and the royalty. *Cf. In re Royalty Pharma,* 2010 SEC No-Act. LEXIS 461, *27-29 (SEC Aug. 13, 2010)(discussing application of the "direct nexus" test for exemption from ICA registration).

record date for voting at the Company's annual meeting (the "Annual Meeting") to be held on September 17, 2024 (the "Voter Subclass"). Excluded from the Class and Voter Subclass are Defendants, their families, and their affiliates.

38.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23 (b) as "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

39.     A class action is superior to other available methods of fair and efficient adjudication of this controversy.

40.     The Class and Voter Subclass are so numerous that joinder of all members is impracticable. The Company's 23.4 million outstanding shares are held by thousands of beneficial stockholders. Consequently, the number of Class members is believed to be in the thousands and are likely scattered across the United States.

41.     There are questions of law and fact that are common to all Class members and that predominate over any questions affecting only individuals, including, but not limited to: (1) whether a court Order should be entered providing that Network-1 meets the definition of an "investment" company, and that its stockholders are entitled to voting rights as specified in ICA Section 15; (b) whether  a court Order should be entered that Plaintiff and Subclass members be permitted to cast a binding vote on the adviser contract and compensation at the Annual Meeting or, alternatively, the vote be voided and a re-vote ordered; (c) whether a court Order should be entered that the violative By-Laws provision cited herein be rescinded under Section 47(b), along with any other By-Laws provisions found inconsistent with the ICA; and (d) whether  a court Order should be entered that the CEO be required to return any unreasonable compensation under ICA Section 36(b) and that his contract, if ever lawful, is now unlawful due to a failure of approval and ratification at the Annual Meeting.

42.    Plaintiff's claims and defenses are typical of the claims and defenses of other class members and Plaintiff has no interests that are antagonistic or adverse to the interest of other class members.  Plaintiff will fairly and adequately protect the interest of the Class.

43.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

44.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

**FIRST CAUSE OF ACTION**
**Relief As To Violations of Section 15(a) of the ICA Providing Voting Rights**

45.    Plaintiff repeats and realleges all previous allegations.  This First Cause of Action is Brought on Behalf of Plaintiff and the Voter Subclass.

46.    ICA Section 15(a), 15 USC §80a-15(a) provides (emphasis added):

**Written contract to serve or act as investment adviser; contents**

It shall be unlawful for any person to serve or act as investment adviser of a registered investment company, except pursuant to a written contract, which contract, whether with such registered company or with an investment adviser of such registered company, *has been approved by the vote of a majority of the outstanding voting securities of such registered company*, and—

(1)  precisely describes all compensation to be paid thereunder;

(2) shall continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by vote of a majority of the outstanding voting securities of such company;

(3) provides, in substance, that it may be terminated at any time, without the payment of any penalty, by the board of directors of such registered company or by vote of

14

a majority of the outstanding voting securities of such company on not more than sixty days' written notice to the investment adviser; and

(4) provides, in substance, for its automatic termination in the event of its assignment.

47.    Network-1 meets the statutory criteria to be deemed an investment company. As such, it cannot evade or refuse to comply with the ICA, or its rules and regulations by reason of its failure to register.

48.    The services provided by Mr. Horowitz render him an "investment adviser" as defined by the ICA.

49.    At the Annual meeting, Network-1 will be conducting a retrospective non-binding "say on pay" vote on CEO's Horowitz's compensation and contract. This is improper.

50.    For the Company to attain compliance with the ICA, Network-1 voters must be provided with a vote that comports with ICA Section 15(a) and places the investment adviser contract before them for binding approval or disapproval, accompanied by adequate disclosures. Such contract must comply with all other ICA provisions.

51.    Without the relief sought herein, the value of property rights held by Plaintiff and the Voter Subclass members will be diminished and irreparably harmed. Such harm is imminent and continuing.

52.    Plaintiff and the Voter Subclass shave no adequate remedy at law, and are deserving of declaratory, injunctive and other equitable relief.

53.    Should a vote proceed without providing Network-1 stockholders their statutory rights, such vote should be voided and a re-vote ordered.

### SECOND CAUSE OF ACTION
### Rescission of Violative By-Laws Under Section 47(b)

54.    Plaintiff repeats and realleges all previous allegations. This Second Cause of Action is Brought on Behalf of Plaintiff and the Class.

55.    Section 47(b)(1), 15 USC 15 USC §80a-46(b)(1), provides:

A contract that is made, or whose performance involves, a violation of this subchapter, or of any rule, regulation, or order thereunder, is unenforceable by either party (or by a nonparty to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this subchapter or of any rule, regulation, or order thereunder) unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this subchapter.

56.    Section 28(a) of Network-1's By-Laws provides:

 All officers shall hold office at the pleasure of the Board of Directors and until their successors shall have been duly elected and qualified, unless sooner removed.  Any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors.

57.    This is inconsistent with the ICA as the CEO, who also serves as investment adviser, can only take and retain office at the behest of the voting stockholders under ICA Section 15(a), and is not "appointed" by the Board of Directors.  In addition, the investment adviser, under ICA Section 15(c) may be removed by the stockholders, even over the objection of the Board. Moreover, the investment adviser's employment contract must be approved *by the stockholders,* not only the Board. Thus, By-Laws Section 28(a) must be rescinded.

58.    Without the relief sought herein, the value of property rights held by Plaintiff and the Voter Subclass members will be diminished and irreparably harmed.  Such harm is imminent and continuing.

59.    Plaintiff and the Class have no adequate remedy at law, and are deserving of rescissory relief.

### **THIRD CAUSE OF ACTION**
### **Return of Excessive Compensation Under Section 36(b)**

60.    Plaintiff repeats and realleges all previous allegations.  This Second Cause of Action is Brought by Plaintiff and the Class on behalf of Network-1, which may derivatively benefit from the relief obtained.  No demand on the Board is required.

61.     Network-1 meets the statutory criteria to be deemed an investment company.  As such, it and its investment adviser are  governed by the ICA, and its rules and regulations, and cannot avoid them by reason of Netowrk-1's failure to register.

62.     The services provided by Mr. Horowitz render him an "investment adviser" as defined by the ICA.

63.     Under Section 36(b), 15 USC § 80a-35(b):

For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply:

(1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.

(2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances.

(3) No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments. No award of damages shall be recoverable for any period prior to one year before the action was instituted. Any award of damages against such recipient shall be limited to the actual damages resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or payment received from such investment company, or the security holders thereof, by such recipient.

(4)  This subsection shall not apply to compensation or payments made in connection with transactions subject to section 80a–17 of this title, or rules, regulations, or orders thereunder, or to sales loads for the acquisition of any security issued by a registered investment company.

(5)  Any action pursuant to this subsection may be brought only in an appropriate district court of the United States.

(6)  No finding by a court with respect to a breach of fiduciary duty under this subsection shall be made a basis (A) for a finding of a violation of this subchapter for the purposes of sections 80a–9 and 80a–48 of this title, section 78o of this title, or section 80b–3 of this title, or (B) for an injunction to prohibit any person from serving in any of the capacities enumerated in subsection (a) of this section.

64.    Horowitz has a fiduciary duty to Network-1.

65.    No allegation is made herein that Horowitz engaged in personal misconduct.

66.    No stockholder approval has been received or is being sought as to the contract granted Horowitz, making such contract unauthorized and *ultra vires*, and justifying forfeiture of all compensation received thereunder.

67.    The fees paid to Horowitz are so disproportionately large to the services provided and the results obtained that they bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

68.    The relevant factors indicate that Horowitz is being considerably overcompensated:

(a)  ***The nature and quality of services provided to the fund shareholders.***  Given that Network-1's Legacy Business is being wound down and the remaining activities are outsourced to patent lawyers, the investment portfolio is what is left to occupy the adviser's time, but it is invested in mundane items that can be selected in a few hours' time.  Moreover, such selection requires little expertise, and can be done effectively by Network-1's Executive Vice President. This presumably leaves the adviser, Mr. Horowitz, with little to do on a daily basis;

(b)  ***The profitability of the fund to the adviser-manager***. As Mr. Horowitz employs no personnel to assist him personally, the profitability of the compensation he received should be at or near 100% profitability. This is too high. Given Mr.

18

Horowitz's substantial ownership in the fund, any person hired would to a large extent be paid out of his pocket (albeit indirectly).  Perhaps because of this, he has limited the Company to only two full-time employees.  This affects Network-1's performance, and contributes to its decline.

(c) **Fall-Out Benefits.** These do not appear relevant to this situation.[12]

(d) **Economies of scale.**  As the funds keep shrinking under the adviser, this factor should weigh towards a minimal advisory fee.

(e) **Comparative fee structures.**  Passive investing in mundane instruments can be obtained from many sources who would charge far less than 1% of assets under management.

(f) **The independence and conscientiousness of the trustees.** While most of the directors appear independent, they also appear to have taken little interest in the Company's well-being and there have been no apparent efforts to stanch its decline. The Board appears to have rewarded the adviser, Mr. Horowitz, significantly for performance that falls very far short of goals set in 2022.

69.     In sum, the compensation paid to Mr. Horowitz is excessive and improperly high under Section 36(b) and should be adjusted downward or completely voided and ordered returned to the Company as it cannot reflect arm's-length bargaining, and is in any event unauthorized and *ultra vires.*

**WHERFORE,** Plaintiff prays for judgment as follows:

A. Determining and declaring that Network-1 meets the definition of an "investment company" under the ICA;

---

[12] Fall-out benefits refer to "those collateral benefits that accrue to the [investment adviser] because of its relationship with the mutual fund." *Pirundini v. J.P. Morgan Inv. Mgmt.*, 309 F. Supp. 3d 156, 168 (S.D.N.Y. 2018)

B.  Determining and declaring that Defendant Horowitz meets the definition of an "investment adviser" under the ICA;

C.  Ordering that, under ICA Section 15(a), Plaintiff and Voter Subclass are entitled to cast a binding vote approving or disapproving the investment adviser's contract and compensation;

D.  Ordering any all provisions of Network-1's By-Laws that conflict with and undermine the ICA be rescinded, including By-Laws Section 28(a);

E.  Determining and declaring that Defendant Horowitz has received and is receiving inordinately high investment adviser compensation, and determining what amount he must return to the Company; and

F.  Awarding all other relief the Court deems just and proper, including an appropriate award of attorneys' and experts' fees.

Dated:  New York, New York
        August 6, 2024

                                        **THE PASKOWITZ LAW FIRM P.C.**

                                        */s/ Laurence D. Paskowitz*
                                        **Laurence D. Paskowitz (LP-7324)**
                                        The Contour
                                        97-45 Queens Blvd., Ste. 1202
                                        Rego Park, NY 11374
                                        212-685-0969
                                        lpaskowitz@pasklaw.com

                                        **KOMLOSSY LAW P.A.**
                                        Emily Komlossy (EK-5908)
                                        4700 Sheridan St., Suite J
                                        Hollywood, FL 33021
                                        Phone: (954) 842-2021
                                        Fax: (954) 416-6223
                                        eck@komlossylaw.com

                                        (Members of the Bar of this Court)

                                        Counsel for Mitchell Mizel